**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

360 MEDICAL CENTERS LLC, a Florida limited liability company,

Plaintiff, Case No.: 2:26-cv-2386

v.

SAMARITAN BIOLOGICS, LLC, a Tennessee limited liability company, and GINNY SZALAY, an individual,

Defendants.
_________________________________/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff 360 MEDICAL CENTERS LLC ("360 Medical" or "Plaintiff"), by and through undersigned counsel, hereby sues Defendants SAMARITAN BIOLOGICS, LLC ("Samaritan") and GINNY SZALAY ("Szalay") (together, "Defendants"), and alleges as follows:

## PRELIMINARY STATEMENT

1. This action seeks declaratory, equitable, and monetary relief arising from Defendants' unlawful scheme to induce Plaintiff to purchase skin substitute grafts at prices grossly exceeding fair market value, structured to be paid contingently upon federal Medicare reimbursement, and enforced through a "Confidence Program" that Defendants represented orally as a balance-waiver mechanism but implemented in writing as an illusory, discretionary, and non-monetary "credit" that violates the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

2. Defendants have demanded from Plaintiff the sum of $844,120.41 as of April 9, 2026, and $851,278.85 as of May 8, 2026 — a claim growing at approximately one percent (1%) per month under a contract that is void *ab initio* as a matter of federal public policy.

3. Because the parties' underlying agreement is void and unenforceable, Plaintiff seeks a judicial declaration to that effect, together with rescission, restitution, and damages arising from the fraudulent scheme.

**PARTIES**

4. Plaintiff 360 MEDICAL CENTERS LLC is a Florida limited liability company with its principal place of business at 3677 Central Ave St., Suite B, Fort Myers, Florida 33901. All members of 360 Medical are citizens of the State of Florida.

5. Defendant SAMARITAN BIOLOGICS, LLC is a Tennessee limited liability company with its principal place of business at 241 Germantown Bend Cove, Cordova, Tennessee 38018. On information and belief, none of Samaritan's members are citizens of the State of Florida.

6. Defendant GINNY SZALAY is a natural person and, on information and belief, a citizen of the State of Tennessee residing in or near Memphis, Tennessee. Szalay is, and at all material times was, a Partner and the Chief Financial Officer of Samaritan.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law and seeks declaratory relief under 28 U.S.C. §§ 2201–2202 to enforce federal public policy embodied in the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

8. This Court has independent subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff (Florida) and Defendants (Tennessee), and the amount in controversy exceeds $75,000, exclusive of interest and costs. The amount in controversy is not less than $844,120.41, as reflected in Defendants' own written demand.

9. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims arise from the same operative facts as the federal claims.

10. This Court has personal jurisdiction over Defendants because Defendants: (a) transacted business in Florida within the meaning of Fla. Stat. § 48.193(1)(a)(1), including by marketing their skin substitute grafts, submitting invoices, and shipping skin substitute grafts into Lee County, Florida; and (b) committed tortious acts in Florida within the meaning of Fla. Stat. § 48.193(1)(a)(2) by directing fraudulent representations to Florida-domiciled Plaintiff.

11. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Lee County, Florida, including the delivery and application of skin substitute grafts, the submission of Medicare claims, and Plaintiff's receipt of Defendants' collection demands.

12. Venue is proper in the Fort Myers Division under M.D. Fla. Local Rule 1.04 because Plaintiff 360 Medical is located in and conducted its business relating to this action in Fort Myers, Lee County, Florida.

## FACTUAL BACKGROUND

### A. The Volume Purchase Agreement

13. On or about January 13, 2025, Samaritan presented Plaintiff with a document captioned "Volume Purchase Agreement – Physician Office" (the "Agreement"), a true and correct copy of which is attached hereto as **Exhibit A**.

14. The Agreement was drafted unilaterally by Samaritan. The Agreement's execution page states expressly: "The Agreement is provided as-is and may not be changed by Office/Facility." (Ex. A at 8.) Samaritan did not permit modification of any material term.

15. The Agreement identifies the "Customer" as: "360 Medical Centers LLC – Sahily Escalar, Jose Rodriguez." (Ex. A at 1.) That identifier is ambiguous, does not correspond to any legal entity as named, and commingles the LLC with two natural persons without specifying whether either or both of the natural persons is a party to the Agreement in his or her individual capacity.

**THIS VOLUME PUCHASE AGREEMENT (the "Agreement")**, dated January 13, 2025 is made by and between Legal Entity Name: 360 Medical Centers LLC – Sahily Escalar, Jose Rodriguez ("Customer") located at: Address: 3677 Central Ave St., Suite B City: Fort Meyers State: FL Zip: 33976 Telephone: 239-790-1263 NPI #: 1033863196 (organization) Fed ID#: 87477383 and Samaritan Biologics, LLC ("Supplier") located at 241 Germantown Bend Cove, Cordova, TN 38018.

16. Jose Rodriguez, an independent-contractor physician affiliated with 360 Medical, did not sign the Agreement. He is not a member of 360 Medical LLC. Notwithstanding his identification in the preamble, he never assented to the Agreement's terms.

17. Sahily Escalar ("Escalar") signed the Agreement solely in her representative capacity as Chief Executive Officer of 360 Medical. (Ex. A at 8.) The Agreement contains no

personal guaranty, no individual-capacity signature line, and no separate obligation of Escalar as an individual.

18. Section 22 of the Agreement, captioned "No Third-Party Beneficiaries," provides: "no provision of this Agreement shall give any rights, remedies, or other benefits to any person or entity other than Supplier and Office/Facility." (Ex. A § 22.)

19. Nowhere in the Agreement is the term "Office/Facility" defined. The Agreement uses the defined term "Customer" in its preamble, then uses the undefined term "Office/Facility" throughout its operative provisions, without explanation.

**B. The Ginny Szalay Signature and § 18 Representation**

20. The Agreement was signed on behalf of Samaritan by Defendant Ginny Szalay, in her capacity as "Partner/CFO." (Ex. A at 8.)

21. Section 18 of the Agreement, captioned "HEALTHCARE COMPLIANCE," provides: "Supplier and Office/Facility agree that both the terms and operation of this Agreement must comply with applicable State and federal law, including without limitation the Anti-Kickback Statute, 42 U.S.C. 1320a-7b(b) and its implementing regulations, 42 C.F.R. §§ 1001.951 and 1001.952; and the False Claims Act, 31 U.S.C. 3729-3731." (Ex. A § 18.)

22. By her signature, Szalay personally represented and warranted to Plaintiff, on behalf of Samaritan and in her individual capacity as Partner and CFO, that the terms and operation of the Agreement complied with the federal Anti-Kickback Statute and the False Claims Act.

23. Section 4.D of the Agreement further acknowledges: "IMPORTANT NOTE: Supplier reminds Office/Facility that Office/Facility may have an obligation to report the pricing

described in this Section 2 and to provide other information under applicable law, including without limitation 42 C.F.R. § 1001.952(h)(1).” (Ex. A § 4.D.) That paragraph is a direct acknowledgment by Samaritan that the pricing structure implicates the federal Anti-Kickback Statute’s discount safe harbor.

**C. The Sales Representative’s Oral Representations and the Preferred Biller**

24. In the period leading up to and continuing after execution of the Agreement, Samaritan communicated with 360 Medical primarily through an authorized sales representative, referred to herein by the initials “S.S.” (the “Samaritan Sales Rep”).

25. At all material times, the Samaritan Sales Rep acted with actual and/or apparent authority to bind Samaritan, to describe the terms of Samaritan’s programs, and to induce orders on Samaritan’s behalf.

26. The Samaritan Sales Rep represented to Plaintiff, in words and substance, that under Samaritan’s “Confidence Program,” 360 Medical would only owe Samaritan for skin substitute grafts on claims that were actually paid by Medicare. In other words, if Medicare denied a claim, 360 Medical would not owe Samaritan for the underlying skin substitute grafts.

27. The Samaritan Sales Rep further directed 360 Medical to submit its Medicare claims through a specific billing person, Mary Hoagland (the “Preferred Biller”), whom the Samaritan Sales Rep represented was Samaritan’s designated and specialized billing resource for its skin substitute grafts.

28. The Preferred Biller consistently confirmed to Plaintiff, in coordination with the Samaritan Sales Rep, that 360 Medical would only owe Samaritan on Medicare-paid claims.

29. Plaintiff's communications with the Samaritan Sales Rep concerning the Confidence Program and the payment structure have been preserved. Certain of those communications are memorialized in tangible form; others were made orally.

**D. The Written Confidence Program**

30. On or about April 9, 2026, Samaritan produced through counsel a document captioned "Samaritan Reimbursement Hub Confidence Program" on Samaritan's letterhead (the "Written Confidence Program"), a true and correct copy of which is attached hereto as **Exhibit B**.

31. The Written Confidence Program provides only "replacement product or statement credit to the Provider or Billing Entity when a patient claim is completely denied after receiving a positive coverage response from Samaritan's Reimbursement Hub." (Ex. B.)

32. The Written Confidence Program does **not** provide for waiver of amounts invoiced by Samaritan. It does not provide for refund of amounts previously paid to Samaritan. It provides only replacement product or store credit toward future purchases from Samaritan.

33. The Written Confidence Program requires the Provider, as prerequisites, to: (a) obtain verified benefits from Samaritan's Hub; (b) submit code-compliant billing; (c) apply the product consistent with IFU and IVR requirements; (d) use appropriate wastage modifiers; and (e) complete two levels of appeal, with the second appeal coordinated through Samaritan's Reimbursement Support Hub. (Ex. B.)

34. Even after completion of the multi-appeal gauntlet, the Written Confidence Program provides that "Approvals for compensation from the Confidence program are subject to

the review of all requested documentation, coordination with Samaritan's Reimbursement Support Hub and at the discretion of Samaritan Biologics." (Ex. B.)

35. The Written Confidence Program expressly acknowledges its implication of the federal Anti-Kickback Statute and the discount safe harbor, stating: "Provider agrees that any replacement product received under the Confidence Program shall be fully and accurately reported as discounts in accordance with the federal antikickback statute (42 U.S.C. § 1320a-7b(b)) and its discount safe harbor regulation (42 C.F.R. § 1001.952(h))." (Ex. B.)

36. The Written Confidence Program further provides that "[a]ny future funds received post settlement for the disputed grafts should be returned to the payor." (Ex. B.) By directing that recovered funds be returned to 'the payor'; (i.e., Medicare) rather than retained by Samaritan or the Provider, Samaritan's own program document acknowledges that the funds at issue are, in economic substance, federal health care program funds subject to the Anti-Kickback Statute, and not the proceeds of an ordinary arm's-length commercial sale. This admission is inconsistent with Samaritan's position that the sums it demands from Plaintiff constitute a private contractual debt untethered to federal healthcare reimbursement.

37. The oral representations of the Samaritan Sales Rep and the Preferred Biller — that 360 Medical would only owe on Medicare-paid claims — are materially inconsistent with the Written Confidence Program's actual terms.

**E. Treatment**

38. Between January 28, 2025 and February 25, 2025, 360 Medical placed five orders with Samaritan for skin substitute grafts, all of which were applied to the wound of a single Medicare beneficiary at 360 Medical's Fort Myers facility:

a. **January 28, 2025**: 3 grafts (three 4.0 × 8.0 cm units), 96 sq cm total;

b. **February 4, 2025**: 3 grafts (two 4.0 × 8.0 cm, one 2.0 × 2.0 cm), 68 sq cm total;

c. **February 11, 2025**: 3 grafts (one 2.0 × 4.0 cm, one 4.0 × 4.0 cm, one 4.0 × 8.0 cm), 56 sq cm total;

d. **February 17, 2025**: 2 grafts (one 2.0 × 4.0 cm, one 4.0 × 8.0 cm), 40 sq cm total;

e. **February 25, 2025**: 3 grafts (one 4.0 × 4.0 cm, one 2.0 × 4.0 cm, one 2.0 × 2.0 cm), 28 sq cm total.

39. All fourteen (14) skin substitute grafts were medically applied to the patient. The graft sizes decreased over time.

40. During the five-order period, 360 Medical purchased 14 skin substitute grafts within a 30-day window.

**F. The Medicare Claim Submissions, Denials, and PTAN Deactivation**

41. 360 Medical submitted claims to Medicare, through the Preferred Biller, for the skin substitute graft applications to the treated patient.

42. During the course of treatment, and without notice or opportunity to cure, the Provider Transaction Access Number ("PTAN") associated with 360 Medical's Medicare enrollment was administratively deactivated by Medicare. 360 Medical received notice of the deactivation by mail only after the deactivation had occurred.

43. Despite 360 Medical's efforts, in coordination with the Preferred Biller, to reactivate the deactivated PTAN, Medicare declined to reactivate and instead issued a new PTAN.

44. The PTAN deactivation resulted in Medicare denials of certain of the claims for the skin substitute graft applications, for reasons wholly outside of Plaintiff's control.

45. Medicare paid on certain of the claims for the skin substitute graft applications and denied others.

**G. Plaintiff's Payments to Samaritan**

46. On August 1, 2025, 360 Medical paid Samaritan by wire transfer the following sums:

a. $81,906.96 (Wire Ref. 004235, invoice 6523), corresponding to 40 sq cm × Samaritan's Volume Account price of $2,047.67 per sq cm;

b. $57,334.87 (Wire Ref. 004184, invoice 6457), corresponding to 28 sq cm × Samaritan's Volume Account price of $2,047.67 per sq cm.

47. Plaintiff made payments to Samaritan in the amount of $139,241.83. These payments were made based on Plaintiff's understanding, derived from the representations of the Samaritan Sales Rep and the Preferred Biller, that 360 Medical was obligated to pay Samaritan only on Medicare-paid claims.

**H. The Application to the Confidence Program and Its Denial**

48. After Medicare denied claims associated with certain of the orders, 360 Medical brought up the verbal representations made by the sales representative hoping the verbal agreement would be honored.

49. Samaritan instructed 360 Medical to apply through the written Confidence Program knowing the verbal representations of the sales representative were starkly different from the Confidence Program.

50. Samaritan utilizes the Confidence Program as a sham to induce medical providers into signing Purchase Agreements with Samaritan under the guise that there is no out-of-pocket expense if Medicare doesn't pay the claim. Meanwhile, Samaritan systematically

denies Confidence Program applications from providers, while continuing to invoice such providers at amounts substantially exceeding fair market value.

**I. Samaritan's Excessive Pricing**

51. Samaritan's Volume Account price for its "Complete AA" skin substitute grafts is **$2,047.67 per square centimeter**. Samaritan's Standard List price for the same product is **$3,412.79 per square centimeter**. (Ex. A, Attachment A.)

52. Effective January 1, 2026, the Centers for Medicare & Medicaid Services ("CMS") reimburses non-BLA cellular and tissue-based skin substitute products at a flat national rate of **$127.14 per square centimeter** under the 2026 Physician Fee Schedule Final Rule.

53. Samaritan's standard pricing is 27 times more expensive than CMS-established reimbursement, making it unconscionable.

54. On September 3, 2025, the U.S. Department of Health and Human Services Office of Inspector General ("HHS-OIG") issued a report titled "Medicare Part B Payment Trends for Skin Substitutes Raise Major Concerns About Fraud, Waste, and Abuse" (Report No. OEI-BL-24-00420), identifying skin substitute products as "particularly vulnerable to questionable billing and fraud schemes" and identifying "spread pricing" as a driver of abusive Medicare billing.

55. The extreme "spread" between Samaritan's invoice price and CMS reimbursement is the economic engine of the scheme alleged in this Complaint. Samaritan induces providers to order at inflated prices by orally guaranteeing that payment obligations are contingent on Medicare reimbursement, while purporting to shift Anti-Kickback Statute compliance

risk to those providers through the Written Confidence Program's disclosure-burden-shifting language. (Ex. B.)

**J. Samaritan's Escalating Demands and the Unauthorized Standard-Fee Re-Pricing**

56. On April 9, 2026, Samaritan, through its counsel Sprechman & Fisher, P.A., demanded that Plaintiff pay the sum of $844,120.41. A true and correct copy of that demand is attached as **Exhibit C**.

57. On May 8, 2026, Sprechman & Fisher, P.A. increased the demand to $851,278.85 — an increase of $7,158.44 in twenty-nine (29) days, consistent with a 1% monthly late charge under Section 5.D of the Agreement applied to approximately $715,000 of asserted principal. A true and correct copy of that demand is attached as **Exhibit D**.

58. The demanded amount is inconsistent with the Volume Account pricing that Samaritan applied to the paid orders. At Volume Account pricing, the unpaid principal on the unpaid orders is approximately $450,487.

59. On information and belief, Samaritan retroactively re-priced the unpaid orders at Standard List pricing (approximately $750,814), notwithstanding that 360 Medical purchased 14 units within a 30-day period — far exceeding the three-unit-per-month Volume Account Purchasing Level threshold in Section 4.C.1 of the Agreement.

60. Section 4.C.3 of the Agreement permits Samaritan to charge Standard List pricing only "subsequently" — prospectively — upon a failure to achieve Volume Account Purchasing Level during a "Corrective Month" following a shortfall. The Agreement provides no authority to retroactively re-price already-invoiced orders. Section 4.C.5 further clarifies that a failure to achieve the Volume Purchasing Level "will not constitute a breach of this Agreement." (Ex. A § 4.C.5.)

61. Samaritan's retroactive Standard-Fee re-pricing of the unpaid orders is therefore a breach of and inconsistent with the Agreement's own terms and constitutes an additional layer of overcharging exceeding $300,000.

## COUNT I
## DECLARATORY JUDGMENT
## VOLUME PURCHASE AGREEMENT VOID AB INITIO
## (28 U.S.C. § 2201; Against Samaritan Biologics, LLC)

66. Plaintiff re-alleges all Paragraphs stated above as previously stated herein.

67. An actual controversy exists between Plaintiff and Samaritan concerning the validity and enforceability of the Agreement, in that Samaritan claims $844,120.41 or more is owed under the Agreement, and Plaintiff contends that no sum is owed because the Agreement is void *ab initio*.

68. The Agreement is void as a matter of federal public policy because its terms and operation violate the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), in that the Agreement, together with the Written Confidence Program and the oral representations of the Samaritan Sales Rep, structures the arrangement so that: (a) 360 Medical's obligation to pay Samaritan is contingent on Medicare reimbursement; (b) 360 Medical was required to use the Preferred Biller to maximize Medicare claims; and (c) the invoice pricing is set at 27 times CMS reimbursement, generating a "spread" that is economically dependent on federal healthcare program payment.

69. Contracts whose terms or operation require or embody violations of the Anti-Kickback Statute are unenforceable as against public policy under both federal and Florida law.

70. Plaintiff is entitled to a judgment declaring the Agreement void *ab initio* and unenforceable.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment declaring the Volume Purchase Agreement void *ab initio* and unenforceable, and awarding Plaintiff its costs and such other relief as the Court deems just and proper.

**COUNT II**
**FRAUDULENT INDUCEMENT**
**(Florida Common Law; Against Both Defendants)**

75. Plaintiff re-alleges all Paragraphs stated above as previously stated herein.

76. To state a claim for fraudulent inducement under Florida law, Plaintiff must establish: (1) a false statement of material fact; (2) the maker's knowledge or reckless disregard of falsity; (3) intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damages.

77. Defendants, through the Samaritan Sales Rep and through Szalay's personal representation in Section 18 of the Agreement, made the following false statements of material fact:

a. That the terms and operation of the Agreement complied with the federal Anti-Kickback Statute;

b. That, under the "Confidence Program," 360 Medical would owe Samaritan only on Medicare-paid claims;

c. That the Confidence Program provided a bona fide balance-waiver mechanism for denied claims.

78. Each of these statements was false. The Written Confidence Program (Exhibit B) provides only replacement product or store credit, not balance waiver, and is subject to

Samaritan's sole discretion after a multi-step appeal gauntlet. The Agreement's Anti-Kickback compliance representation is contradicted by the Agreement's own operation.

79. Defendants knew, or acted with reckless disregard as to whether, these statements were false. Szalay, as Partner and CFO, had actual knowledge of the terms and operation of the Written Confidence Program and of the pricing spread. Samaritan corporately drafted the Written Confidence Program.

80. Defendants intended Plaintiff to rely on the statements to induce execution of the Agreement, submission of orders for skin substitute grafts, and use of Samaritan's Preferred Biller.

81. Plaintiff reasonably relied by executing the Agreement and by ordering 14 skin substitute grafts within a 30-day period, expending time and resources on treatment, and submitting Medicare claims through the Preferred Biller.

82. As a direct and proximate result, Plaintiff was injured, including but not limited to: (a) exposure to a claim of $844,120.41 or more; (b) loss of the $139,241.83 in payments already made; and (c) attorney's fees, costs, and consequential damages.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendants for compensatory damages, rescission, restitution, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper. Plaintiff reserves the right to seek leave to plead punitive damages upon a proffer under Fla. Stat. § 768.72.

## COUNT III
## NEGLIGENT MISREPRESENTATION
## (Florida Common Law; Against Both Defendants)

83. Plaintiff re-alleges all Paragraphs stated above as previously stated herein.

84. To state a claim for negligent misrepresentation under Florida law, Plaintiff must establish: (1) a misrepresentation of material fact; (2) that the representer either knew of the misrepresentation, made it without knowledge of its truth or falsity, or should have known its falsity; (3) that the representer intended to induce another to act on the misrepresentation; and (4) that injury resulted to a party acting in justifiable reliance.

85. Defendants made the misrepresentations described herein.

86. To the extent Defendants did not know that such representations were false, Defendants made the representations without knowledge of their truth or falsity, or should have known of their falsity in light of the terms of the Written Confidence Program, the pricing spread, and the Anti-Kickback Statute's requirements.

87. Defendants intended to induce Plaintiff to act upon the representations by entering the Agreement, ordering skin substitute grafts, and using the Preferred Biller.

88. Plaintiff justifiably relied and was injured in the amount of $139,241.83.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendants for compensatory damages, restitution, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

**COUNT IV**

**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

**(Fla. Stat. §§ 501.201 et seq.; Against Both Defendants)**

89. Plaintiff re-alleges all Paragraphs stated above as previously stated herein.

90. FDUTPA prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204.

91. Defendants' acts and practices constitute unfair and deceptive acts under FDUTPA, including: (a) marketing the Confidence Program orally as a balance-waiver program while implementing it as a discretionary store-credit program; (b) inducing purchases through pricing 27 times CMS reimbursement while shifting Anti-Kickback compliance to the purchaser; (c) requiring use of a Preferred Biller as a condition of the purported reimbursement guarantee; and (d) retroactively re-pricing invoiced orders in a manner not authorized by the Agreement.

92. Defendants' conduct occurred in the conduct of trade or commerce.

93. Plaintiff is a "consumer" within the meaning of FDUTPA, as broadly construed.

94. Plaintiff has suffered actual damages proximately caused by Defendants' conduct, including but not limited to $139,241.83 previously paid.

95. Szalay is individually liable under FDUTPA because she personally participated in, directed, and controlled the deceptive acts, and she personally represented compliance with the Anti-Kickback Statute in Section 18 of the Agreement.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendants for actual damages, declaratory and injunctive relief, attorney's fees and costs pursuant to Fla. Stat. § 501.2105, and such other relief as the Court deems just and proper.

## COUNT V
## CIVIL RICO

**18 U.S.C. § 1962(c)**

**(Against Defendant Ginny Szalay, Individually)**

96. Plaintiff re-alleges all Paragraphs stated above as previously stated herein.

97. To state a claim under 18 U.S.C. § 1962(c), Plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, causing (5) injury to Plaintiff's business or property.

98. Defendant Ginny Szalay is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

99. Defendant Samaritan Biologics, LLC is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). Samaritan is a legal entity separate and distinct from Szalay individually, and its activities affect interstate commerce.

100. Szalay is distinct from the Samaritan enterprise because she is a natural person and Samaritan is a limited liability company. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001).

101. Szalay conducted and participated, directly or indirectly, in the conduct of Samaritan's affairs. As Partner and CFO, Szalay had authority over Samaritan's pricing structure, its Confidence Program, its sales-representative arrangements, its Preferred Biller relationships, and its collection strategy. Szalay personally signed the Agreement on behalf of Samaritan and personally represented Anti-Kickback compliance in Section 18 thereof.

102. The racketeering activity consists of a pattern of federal health care fraud in violation of 18 U.S.C. § 1347, an enumerated predicate under 18 U.S.C. § 1961(1)(B).

103. Section 1347 prohibits knowingly and willfully executing, or attempting to execute, a scheme to defraud any health care benefit program, including Medicare, or to obtain by means of false or fraudulent pretenses money or property owned by or under the custody or control of any health care benefit program.

104. Szalay knowingly caused, and participated in, the submission of claims to Medicare on behalf of and in connection with providers, including 360 Medical, for skin substitute graft products supplied under an arrangement that violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, in that: (a) the Confidence Program constituted remuneration to induce purchases and referrals; (b) the required use of the Preferred Biller constituted an in-kind steering arrangement; and (c) the marked-up pricing structure was designed to extract Medicare reimbursement in excess of the fair market value of the products.

105. Each claim to Medicare tied to a Samaritan skin substitute graft supplied to any provider under this arrangement is a separate predicate act of health care fraud, forming a pattern extending from at least January 2025 through the present.

106. Plaintiff has been injured in its business and property by reason of the pattern of racketeering activity, including but not limited to the $844,120.41+ claim now asserted against it, the $139,241.83 already paid, and consequential and incidental damages.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendant Szalay for treble damages pursuant to 18 U.S.C. § 1964(c), attorney’s fees and costs, pre- and post-judgment interest, and such other relief as the Court deems just and proper.

**COUNT VI**

**CIVIL CONSPIRACY**

**(Florida Common Law; Against Both Defendants)**

107. Plaintiff re-alleges all Paragraphs stated above as previously stated herein.

108. To state a claim for civil conspiracy under Florida law, Plaintiff must allege: (1) an agreement between two or more parties; (2) to do an unlawful act or a lawful act by unlawful means; (3) an overt act in furtherance; and (4) resulting damages.

109. Samaritan, Szalay, the Samaritan Sales Rep, and the Preferred Biller entered into an agreement to induce providers, including 360 Medical, to enter Volume Purchase Agreements and order skin substitute grafts through means that were unlawful and that constituted fraud, deceptive trade practices, and violations of the Anti-Kickback Statute.

110. Szalay personally benefited from and directed the scheme in her individual capacity as Partner and CFO, defeating any application of the intracorporate conspiracy doctrine.

111. Numerous overt acts occurred in furtherance, including the drafting and execution of the Agreement, the marketing and oral description of the Confidence Program, the designation of the Preferred Biller, the invoicing at inflated Standard-Fee pricing, and the demands for payment through Sprechman & Fisher, P.A.

112. Plaintiff was damaged as set forth herein.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendants for compensatory damages, restitution, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

**COUNT VII**

**UNJUST ENRICHMENT**

**(Florida Common Law; Against Both Defendants)**

113. Plaintiff re-alleges all Paragraphs stated above as previously stated herein.

114. Plaintiff conferred a benefit on Defendants by paying $139,241.83 to Samaritan on August 1, 2025.

115. Defendants voluntarily accepted and retained the benefit.

116. The circumstances render Defendants' retention of the benefit inequitable, in that the Agreement pursuant to which the payments were extracted is void *ab initio* as a violation of the federal Anti-Kickback Statute, and Samaritan induced the payments through fraudulent misrepresentations concerning the Confidence Program.

117. This claim is pleaded in the alternative to Plaintiff's contractual and rescission-based claims.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendants for restitution of $139,241.83, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

**COUNT VIII**
**RESCISSION**
**(Florida Common Law; Against Samaritan Biologics, LLC)**

118. Plaintiff re-alleges all Paragraphs stated above as previously stated herein.

119. Under Florida law, a party may obtain rescission of a contract that is void for illegality or that was procured by fraudulent inducement.

120. The Agreement is void for illegality and was procured through fraudulent inducement.

121. Plaintiff stands ready to restore any benefit received to the extent required by equity, subject to setoff for amounts paid.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment rescinding the Volume Purchase Agreement in its entirety, ordering restitution of all sums paid by Plaintiff to Samaritan, costs, and such other relief as the Court deems just and proper.

**COUNT IX**
**DECLARATORY JUDGMENT — UNCONSCIONABILITY**
**(28 U.S.C. § 2201; Against Samaritan Biologics, LLC)**

122. Plaintiff re-alleges all Paragraphs stated above as previously stated herein.

123. An actual controversy exists between Plaintiff and Samaritan concerning the enforceability of the Agreement on grounds of unconscionability.

124. The Agreement is procedurally unconscionable in that it was drafted unilaterally by Samaritan, presented on a take-it-or-leave-it basis with the express statement that it "may not be changed by Office/Facility," (Ex. A at 8), and marketed with materially inconsistent oral representations concerning the Confidence Program.

125. The Agreement is substantively unconscionable in that: (a) it sets pricing at 27 times CMS reimbursement; (b) it purports to bind ambiguously identified "Customer(s)" including a non-signatory physician; (c) it deploys undefined operative terms ("Office/Facility"); (d) it purports to permit unilateral retroactive re-pricing beyond what its own text authorizes; (e) it purports to shift Anti-Kickback Statute compliance risk to the purchaser; and (f) it conditions rescission-adjacent relief on an illusory, discretionary "Confidence Program."

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment declaring the Agreement unconscionable and unenforceable in whole or in part, and awarding Plaintiff its costs and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff 360 Medical Centers LLC respectfully requests that this Court:

A. Enter a judgment declaring the Volume Purchase Agreement void *ab initio* and unenforceable;

B. Enter a judgment declaring the Agreement unconscionable and unenforceable in whole or in part;

C. Enter a judgment declaring the payment structure was designed to evade the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b;

D. Enter a judgment rescinding the Agreement and ordering restitution of all sums paid to Samaritan under the void Agreement;

E. Award Plaintiff attorney's fees and costs under Fla. Stat. § 501.2105, 18 U.S.C. § 1964(c), and any other applicable authority;

F. Award Plaintiff treble damages against Defendant Ginny Szalay pursuant to 18 U.S.C. § 1964(c);

G. Reserve to Plaintiff the right to seek leave to plead punitive damages pursuant to Fla. Stat. § 768.72; and

H. Award such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands trial by jury on all claims so triable.

Dated this Tuesday, August 18, 2026.

Respectfully Submitted,
Ovadia Law Group, P.A.
4800 N Federal Hwy, Suite D204
Boca Raton, FL 33431
(T) 800.674.9396

/s/ Chris Kasper
CHRIS KASPER, ESQ.
Florida Bar No. 66382

/s/ Abraham Solomon Ovadia
ABRAHAM SOLOMON OVADIA, ESQ.
Florida Bar No. 70189